IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 30, 2018

**STATE OF TENNESSEE v. TAYLOR SATTERFIELD**

**Appeal from the Criminal Court for Hamilton County**
**No. 294056   Don W. Poole, Judge**

_____

**No. E2017-02207-CCA-R3-CD**

_____

The Defendant-Appellant, Taylor Satterfield, was indicted by the Hamilton County Grand Jury for first degree premediated murder, tampering with evidence, and unlawful possession of a deadly weapon.  He then filed a motion to suppress his statement to police, which was denied.  After the State dismissed the tampering with evidence and weapon charges, the Defendant's case proceeded to a jury trial on the first degree murder charge, and he was convicted of the lesser included offense of second degree murder and sentenced to twenty-two years in confinement.  On appeal, the Defendant argues:  (1) the trial court erred in denying his motion to suppress his statement; (2) the evidence is insufficient to sustain his conviction; and (3) he received an excessive sentence.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and TIMOTHY L. EASTER, JJ., joined.

Steve E. Smith, District Public Defender (on appeal) and Theodore A. Engel, III (at trial and on appeal) and Coty Wamp (at trial), Assistant District Public Defenders, for the Defendant-Appellant, Taylor Satterfield.

Herbert H. Slatery, III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Neal Pinkston, District Attorney General; and Cameron Williams and Andrew Coyle, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

This case concerns the fatal shooting of the victim, Keiara Patton, who was the girlfriend and mother of two of the Defendant's children.  The day of the shooting, the Defendant was apprehended and charged in this case.

**Suppression Hearing.**  On March 24, 2016, the Defendant filed a motion to suppress any and all statements he gave to police.  The Defendant claimed that the police subjected him to an unlawful interrogation, used coercive techniques, failed to employ mandated procedural safeguards, and failed to stop questioning the Defendant when the law so required.  The Defendant also claimed that the defective interrogation led to his providing an involuntary statement because his will was overborne by the actions of the police.

At the March 28, 2016 suppression hearing, Investigator Matthew Puglise of the Chattanooga Police Department testified that on May 13, 2014, he heard a radio dispatch that a shooting had occurred at 804 West 13th Street.  When he arrived at the scene, the victim, who had sustained a gunshot wound to the head, had already been transported to Erlanger Hospital, where she later died.  Investigator Puglise was informed that the Defendant, the victim's boyfriend, was a possible suspect because he had left the scene shortly after the shooting.  While at the scene, Investigator Puglise spoke to two women in the apartment complex's leasing office, who said they heard gunshots, saw the Defendant run to a Dodge Durango parked on Grove Street, and observed the Defendant placing something on the passenger side of that vehicle.

Investigator Puglise said he and Investigator Kenny Burnette approached this Dodge Durango and searched the surrounding area.  Moments later, Investigator Burnette observed a gun that had been hidden underneath a sewer drain near the Durango, and he collected this gun as evidence.

Investigator Puglise said he later learned that the Dodge Durango belonged to Breasia Hubbard.  Shortly thereafter, Hubbard arrived on the scene and consented to a search of the Durango.  Investigator Puglise said Hubbard told him that she had given the Defendant permission to drive her vehicle after he had dropped her off at Howard High School.  Investigator Puglise said that a BOLO, or "be on the lookout" call, was placed for the Defendant and that the Defendant was later apprehended at the hospital and transported to the police station to be interviewed.

Investigator Puglise said he and Officer Kendra Adams were present during the Defendant's interview.  The Defendant was not handcuffed during the interview.  Investigator Puglise read the Defendant his constitutional rights, and the Defendant initialed each line indicating that he understood each of his constitutional rights.  Investigator Puglise then read the Rights Waiver Form and had the Defendant read this form.  He asked the Defendant if he had any questions about the Rights Waiver Form before having the Defendant sign this form.  He confirmed that the Defendant appeared to understand the Rights Waiver Form.  Investigator Puglise said that the Defendant did not appear to be under the influence of alcohol or any other substance during the

interview. He said he did not threaten or coerce the Defendant and did not withhold any "creature comforts" during the interview.

After the Defendant signed the Rights Waiver Form at 11:43 a.m., Investigator Puglise and Officer Adams signed the form. Thereafter, the Defendant gave a statement that was audio/video recorded. This recording was played during the suppression hearing.

The recording of the interview shows that the Defendant initially told Investigator Puglise he did not know what happened to the victim. He said he had not come home the night before, and the victim had told him that the next time he did not come home, she was going to kick "all [his] s[--]t out." On May 13, 2014, the Defendant went to the front door of the victim's apartment and called her name, but she never answered. The Defendant said he walked upstairs, and when he saw the victim lying on the floor, he ran outside. As he was running down the steps, the Defendant saw Breasia Hubbard's mother and told her something was wrong and asked her to help him and help the victim because she had been shot. He said he later called 9-1-1 from his neighbor's phone.

The Defendant said that a short time later, his sister picked him up and took him to the hospital. He denied that he and the victim had argued that day and claimed that he had not seen or talked to the victim prior to seeing her lying on the floor.

After the Defendant gave the first part of his statement, he asked Officer Adams and Investigator Puglise about the victim's medical condition, and Investigator Puglise told him that the victim had not passed away.

Investigator Puglise left the interview room, and when he returned a short time later, he informed the Defendant that he had just received news that the victim had died. The Defendant pulled his shirt over his face, pushed his chair back, and began crying. The Defendant then pushed himself out of his chair and began stomping his feet. Then Investigator Puglise, Officer Adams, and the Defendant had the following conversation:

Investigator Puglise:   Listen man, I need you to help. You got to sit up and help me, man. We'll get over it.

The Defendant:   Oh.

Investigator Puglise:   Listen, listen, the quicker we can—

The Defendant:   That's my girl.

Investigator Puglise: Listen, the quicker we can do this, the quicker we can find out who did this. Who would do this to her?

The Defendant: I don't know the f[--]k who did it, I'm going to f[--]k everybody, though.

Investigator Puglise: Sit down.

The Defendant: I'm going to f[--]k everybody.

Investigator Puglise: Sit down. What time did you get there? Look at me.

The Defendant: I don't know what time.

Investigator Puglise: What time did you drop your girl off at the school?

The Defendant: I don't even know anymore.

Investigator Puglise: Come on, sit, let's get this over with.

The Defendant: That my girl, bro, you don't understand, bro, my girl, bro.

Officer Adams: We got to talk to you so we can find out who did this, okay?

The Defendant: Anybody can did it, I don't know the f[--]k who, anybody, everybody did, I don't know f[--]k, brother. That's my girl, bro. Oh, Kei[a]ra, you ain't do me like this, bro. You didn't leave me, bro. You didn't leave, bro. You got to be strong, bro. You got to be strong, bro.

Investigator Puglise: How many kids you got with her? How many children you have?

[The Defendant is crying]

| | |
|---|---|
| Investigator Puglise: | All right. I'm going to give you some time and I'll come back. You hear me? I'm going to give you a little bit of time, all right? But we've got to get—listen. |
| The Defendant: | I rather get it out of the way, bro. |
| Investigator Puglise: | You want to get it out of the way? All right. Come here and sit down. |
| Officer Adams: | And then you can vent, okay? Just talk to him and answer his questions and then you can vent. |
| The Defendant: | Y'all don't understand, that's my girl. I've known her five years, since I was 15 years old, bro. |
| Investigator Puglise: | Okay. We need to figure out as much information for me right now and then let you get out of here. Come on. Sit. Sit here and let's finish this up. I know it's hard, man, I feel for you. |

Investigator Puglise continued interviewing the Defendant, and the Defendant said he was the first person to find the victim. He denied hearing any fighting or commotion prior to discovering the victim. Investigator Puglise left the interview room.

When Investigator Puglise returned, the Defendant said that when he walked up the stairs to the victim's apartment, he saw blood and ran out the door and fell on the ground outside. He said that his belongings were outside the victim's apartment. He explained that the victim and Breasia Hubbard had talked and informed him that he had to pick one of them and if he did not, they were going to "kick [his] stuff out." The Defendant denied having a gun or firing a gun that day and asserted that he did not have a gun because he had just come from court when he found the victim. The Defendant also denied that he ran back to the Dodge Durango before trying to reenter the victim's apartment. Investigator Puglise and Officer Adams left the interview room, and the Defendant began crying again before getting his emotions under control.

When Officer Adams returned to the interview room, the Defendant had the following exchange with her:

The Defendant:          Can you tell me my girl alive?

Officer Adams:          What?

The Defendant:          Can you tell me my girl alive?

Officer Adams:          I'd like to tell you that, but she's not.

The Defendant:          No.

[The Defendant begins to cry again].

The Defendant:          My girl.   What I supposed to do, what I supposed to do?

Officer Adams:          You got to hang in there for your kids.

The Defendant:          I don't even.  You don't understand.

Officer Adams:          Tell us everything you know so we can find who did it.

The Defendant:          I done told you everything.  I don't know what the f[--]k happened to tell nobody, I don't know what to tell nobody.

Officer Adams:          Can't think of anything else?

The Defendant:          What to tell you?  What you want me to tell you.  Just tell me that, what you want me to tell you?

Officer Adams:          What all you know.  The truth and what all you know.

The Defendant:          Well, what do you want me to know, I mean what do you want me to tell you?

Officer Adams:          Everything you know, the truth.

The Defendant:          Do you saying I'm lying to you?

- 6 -

Officer Adams:        No, I'm not saying you're lying, you just, I'm saying you just say the truth and everything you know.

The Defendant:        You don't understand.  Listen to me, listen to me, I'm going to tell you the honest to God truth.  If I—I'm going to tell you this, if I knew who did this, I'm going to tell you this the God honest truth, I going to tell you, I don't know who did it, but even if I did, I wouldn't, plus, the fact, killed my girl, bro.

                      I don't know, man, I feel like I'm going crazy, I don't f[--]king know.  My girl, my momma, my homies, everybody dying.  My friend, he died, all f[--]king (unintelligible), just buried him last month.  My momma gone, guy I look up like my dad, like my big brother, he got killed.  I done lost five people in two years and I'm the only one here.  I don't know what God trying to tell me though.

Officer Adams:        Well, you got to hang in there for your kids.

The Defendant:        Look at this, though, my kids, like I'm a good dad and all, but like I'm a child myself.  I feel like I'm a child my dang old self.  So who am I to fight, I don't even know how to take care of my own kids.  I can't even take care of like my dang old self, (unintelligible).

[Investigator Puglise enters the interview room]

Investigator Puglise:  Hey, that SUV, that brown one, it's a Dodge, 2000 Dodge Durango.

[Investigator Puglise's phone rings, and he leaves the interview room]

Officer Adams:        You got to tell everything you know and the truth, okay?  For your kids.

| | |
|---|---|
| The Defendant: | I done told everything, but I can't tell no more. What you want me to tell you, that what I'm asking like, you saying, like? |
| Officer Adams: | No, I'm just telling you[,] you need to tell everything you know. If you, why would somebody want to hurt her? |
| The Defendant: | I already just told you, somebody did that to my girl, then they coming for me, my girl don't mess with nobody, I already said that. My girl don't mess with nobody, so if they come for me, they were trying to kill me. I'll say it was me. I don't do nothing, so if they coming for me, you got to be coming for my money. People think I got money. See how I dress? I got Jordans on, I just got, I'm flash. I never have nothing in my life, I struggled all my life, and when I got my money, I bought me whatever I want. |
| Officer Adams: | Just tell him all that, or just answer his questions. |

When Investigator Puglise returned to the interview room, the Defendant denied owning a black Springfield .40 caliber handgun. The Defendant said that the last time he talked to the victim in person was the day before when he was at her apartment. At that point during the interview, Investigator Puglise's cell phone rang, and he answered it. While he was on the phone, he informed the Defendant that the police had found the gun he placed behind the Dodge Durango, which was the same gun the Defendant used to shoot the victim in the head. Investigator Puglise asked the Defendant, "Do you want to say why you shot her?" The Defendant replied, "I already knew this was going to happen. I want to tell the truth."

Investigator Puglise asked the Defendant if he shot her out of passion, and the Defendant answered, "There wasn't no passion." The Defendant told Investigator Puglise that he pretended that he was going to kill himself because he did not want to leave the victim's apartment, and the victim grabbed the gun, causing it to discharge. The Defendant said that when the gun fired, the victim was trying to keep him from shooting himself. He asserted that he did not stay with the victim after she was shot because he did not want his children to see the victim. The Defendant stated that there

were knives on the kitchen floor because the victim believed he was going to hurt her and was attempting to protect herself. He said he was wearing a button-up shirt at the time of the shooting because he had just been at court. At that point, Investigator Puglise left the interview room, and the Defendant acknowledged that he was responsible for killing the victim. He said that although the victim "did come at [him]," there was no reason for her to be shot. Another officer collected the white t-shirt the Defendant was wearing, and the Defendant lay down on the floor.

When Investigator Puglise returned to the interview room, the Defendant sat in his chair. Officer Adams told the Defendant to tell Investigator Puglise what he had just told her. The Defendant then gave the following statement:

> When I came in the house, my girl, we was arguing, (inaudible). She basically just, I'm through, running (phonetically). F[--]k this s[--]t, man. I already had the gun in my hand, walking around, because that what I do when we were arguing. And she will say, just stay, you don't need to be going out there like that at night. So she starts freaking out, she grabs her two knives out the drawer. I'm like, oh s[--]t. I was like, all right, I'm fixing to go, I'm fixing to go. She took my s[--]t, she throwing it out, everything out. She grabbed her key because she knew I'd grab her keys and I still got to come in.
>
> She had the knife, she like, f[--]k this s[--]t, now get the f[--]k out, get the f[--]k out. I didn't think she was going to stab me, though. She charged at me with the two knives and I was standing on the side of the stove, I stepped back like, dang, hold on, hold on. So I closed the door, closed, and she swung, swung, and then boom.

The Defendant said he was standing in the doorway, and he was attempting to shut the door so the victim could not leave. When the victim charged him with a knife in each hand, he "leaned back" and when the victim swiped the gun, "it went off," even though he never had his finger on the gun's trigger. After the gun went off, the Defendant said he "flipped out" and hoped that the bullet had "missed her." He said he went outside, and broke down. Eventually, his brother went inside the victim's apartment. When his brother came out, he told the Defendant to get his kids and go.

After the recording of the interview was played, Investigator Puglise resumed his testimony at the suppression hearing. He said that after the Defendant gave this statement, he charged him with criminal homicide, aggravated assault, tampering with evidence, and unlawful possession of a weapon. Investigator Puglise acknowledged that the Defendant became very upset when he discovered that the victim had passed away.

On April 1, 2016, the trial court entered a written order denying the motion to suppress. In it, the court made the following findings, in pertinent part:

The Court understands the defendant to contend that, despite an initially valid waiver of rights, his statements are involuntary because post-waiver police commands effectively negated the waiver and exploited his visible distress, overbearing his will. The Court agrees that the initial waiver of rights was valid. It was voluntary, being as free from coercion as possible, and intelligent.

The Court, however, respectfully disagrees that, thereafter, the police overbore the defendant's will. The defendant's distress did not prevent him from denying knowledge of the shooter. Even when police became confrontational, they did not coerce him by making promises or threats. Their directions to sit and exhortations to "hang in there for your kids" were more in the nature of efforts to encourage the defendant to collect himself.

Nor does any misrepresentation about the victim's condition or the gun render the defendant's statement involuntary or unintelligent.

**Trial.** At the July 19-22, 2016 trial, Officer Jeff Kirk with the Chattanooga Police Department testified that on May 13, 2014, he received a radio dispatch that shots had been fired in an apartment in the College Hill Courts complex at 803 West 13th Street Court. When he arrived at this address, Officer Kirk observed a stack of clothes outside the back door. He walked up the stairs, and when he entered the apartment, he saw the victim lying on the kitchen floor with EMS attending to her. The victim was lying in an "L-shaped, fetal position" with her face and knees toward the front door. Although the victim was alive, she was bleeding profusely and was attempting to breathe. He noticed two knives on the floor near the front door of the apartment and saw that the stove had been moved out of place. Officer Kirk said he never saw the Defendant inside the victim's apartment.

Huguette Ciza, a student at Sewanee, testified that she had heard of the victim, who lived in the apartment next door, but did not know her personally. Although Ciza did not know the Defendant, she had seen him living in the apartment with the victim.

Ciza said that on the morning of May 13, 2014, she was reading in her living room when she heard the Defendant and the victim having an argument, which lasted approximately five minutes. She was unable to hear exactly what they said, but she could tell that their voices were raised, and the argument ended when she heard a single

"popping sound." Because she had never heard a gunshot before, she did not know whether the sound was a gun being discharged or a firecracker being set off. After hearing this sound, Ciza looked out her window and saw the Defendant, who was holding a small gun and "looked very worried." The Defendant was repeatedly screaming, "My girl, my girl."

When Ciza saw the Defendant with the gun, she knew that something bad had happened. She opened her door slightly and could see that the victim's door was open and that there was a substantial amount of blood inside the victim's apartment. When the Defendant began screaming, people began to gather outside to help, and Ciza ran downstairs to allow them to come inside the building. After Ciza opened the door to let these people in, the Defendant ran upstairs to the victim's apartment to see what was going on and then ran back down the stairs, and Ciza never saw him again. Ciza then called 9-1-1.

Sherill Jones, the leasing representative for the College Hill Courts apartments, testified that on the morning of May 13, 2014, she observed a young African-American male with shoulder-length dreadlocks running back and forth from the center of West 13th Street toward Grove Street. The first time she saw this man run past, he was wearing a plaid or checked button-front shirt; however, when he ran past her a second time, he was wearing only a white sleeveless undershirt. She saw this man run to the passenger side of a tan or bronze Dodge Durango SUV, but she was unable to see what he was doing. Jones said she became aware that something bad had happened because just after she saw the young African-American man run by, she heard people screaming that someone had been shot, and individuals began calling and coming into the leasing office. Later, Jones suggested that the police look for evidence in the sewer drain on the passenger side of the Dodge Durango because this was the area in which the young African-American man had gone.

Kimberly Bell, who worked at the College Hill Courts apartments, said that she did not know the victim but knew the Defendant because he was a distant relative. On May 13, 2014, Bell became aware that something had happened at one of the apartments because she heard people screaming and thought she heard that someone had been shot in the leg. Bell and Kevin Stubblefield, another apartment employee, went to check on what had happened, and as they were walking to the scene of the disruption, they ran into the Defendant. The Defendant was screaming and crying and repeatedly saying that someone had shot his girl. She described the Defendant as "extremely hysterical."

Bell asked the Defendant what happened, and the Defendant said, "Well, d[--]n, they shot my bitch." She asked where the victim was, and the Defendant pointed toward the victim's apartment. Stubblefield headed up the stairs to the victim's apartment, and

Bell followed behind him. As Bell began climbing the stairs, Stubblefield immediately turned around and walked back down. When Bell asked him what had happened, Stubblefield told her he was not going inside the victim's apartment.

Bell proceeded up the stairs to the victim's apartment. When she entered the victim's kitchen, Bell saw the victim lying on the floor with a set of keys clenched in her hands. Bell immediately stopped because she could see that the victim, who had been shot in the head, was taking heavy breaths. Bell observed that the refrigerator had been moved into a "catty-corner" position and that the stove had been pulled out from the wall. She knew that the victim was not going to live because her brains were no longer inside her head.

Bell vaguely recalled seeing a knife but did not think it was out of place because she and the victim were in the kitchen. She said an older lady was standing in the kitchen when she arrived. Bell asked this lady if there were children in the apartment, and the lady replied that the children's father had taken them out of the apartment. Shortly thereafter, the older lady left, and an EMT arrived and told Bell to leave the apartment. Bell admitted that she did not initially tell the police about the victim clutching the set of keys; however, she said she discussed this particular fact with the people in the leasing office and later told the police that the victim had keys in her hand. Bell said, "[W]hat stood out the most in my mind [wa]s the fact this girl had keys clenched in her hands, like whatever had transpired, you was not getting her keys."

Breasia Hubbard testified that the Defendant was the father of her three-year-old child. Hubbard said she had known the Defendant for four years and knew the victim because the Defendant and the victim had two children together. She was familiar with the College Hill Courts apartments because her mother lived in that complex.

Hubbard said that the Defendant spent the night of May 12, 2014, at her house and rode with her to her high school around 9:30 a.m. the morning of May 13, 2014. Once they arrived at her school, the Defendant told Hubbard that he was going home to his residence at 12th and Holly Street in Highland Park and drove away in her Dodge Durango. Hubbard said that a short while later, her mother called to check on her because she had heard that someone had been shot at the victim's apartment and had seen Hubbard's Dodge Durango parked near the victim's apartment. Upon hearing this news, Hubbard left school and rode with her aunt to the victim's apartment, where she saw her Dodge Durango parked near the College Hill Courts apartments. When she arrived at the scene, the police questioned her about the shooting. Approximately three hours later, the police gave her permission to take her SUV, and she used her spare key to drive it home. Hubbard said that after the Defendant drove off in her car from the high school, she did not see him again until he was arrested.

- 12 -

Hubbard stated that she talked to the victim on Mother's Day, which was a couple of days before the shooting. That night, Hubbard texted the Defendant's phone, and the victim replied to the text, and Hubbard realized that the Defendant was with the victim. After she and the victim texted back and forth several times, Hubbard called the victim. During this phone conversation, Hubbard and the victim argued and then finally discussed the fact that they were tired of the Defendant dating them both. Hubbard said the victim told her that she had bought two knives and that she was going to stab the Defendant "so maybe he'll act right." The victim said she hid these knives under her mattress; however, Hubbard did not believe the victim would actually stab the Defendant.

Hubbard said that a detective interviewed her at the College Hill Courts apartments because her vehicle was involved in the case. At the time, she knew that the victim had been shot but did not know that the Defendant was a suspect. Hubbard lied to the police when she told them that she and the Defendant were not romantically involved and that the Defendant had not spent the night of May 12, 2014 with her. She also lied to the police when she told them that she and the victim had talked on Sunday night and that they had discussed positive things, including what the victim and the Defendant had done with the kids on Valentine's Day. Hubbard said she never informed the police that the victim had told her she was buying knives so she could stab the Defendant. She said she lied to the police because she did not want to be involved in the shooting.

Joseph Montijo, a crime scene investigator with the Chattanooga Police Department, testified that he went to the hospital to photograph and document the victim's injuries. Upon arriving there, he observed that the victim had sustained a gunshot wound to the right side of her head, which caused the victim's brain matter to come out of her skull. The victim had been placed on a breathing apparatus, and the bedsheet around her was soaked in blood. He also noticed that blood was coming out of the victim's nose and mouth. Investigator Montijo took pictures of the victim's injuries, collected her blood-soaked clothes, and collected gunshot residue samples from her hands. After the Defendant was taken into custody, Investigator Montijo photographed and fingerprinted him, took a buccal swab for DNA testing, collected the Defendant's white t-shirt, and collected gunshot residue samples from the Defendant's hands. He said that the photographs he took showed that the Defendant did not have any visible injuries.

Gregory Mardis, a crime scene investigator with the Chattanooga Police Department, testified that on May 13, 2014, he photographed the crime scene after the victim had been transported to the hospital. He specifically took photographs of two kitchen knives, a bullet fragment, and a set of keys that were on the kitchen floor. He noted that the kitchen knives had blood spatter on the handles. Investigator Mardis said that only one shell casing was found, and this casing was jammed into the ejection port for the Springfield .40 caliber handgun recovered. He stated that after photographing and

collecting the evidence at the crime scene, he went to the medical examiner's office to collect a projectile that was recovered from the victim's body, as well as jewelry, biological samples, a DNA sample, scalp hair, and fingernail clippings from the victim.

James Kenneth Metcalfe, M.D., the Hamilton County chief medical examiner and an expert in forensic pathology, testified that he performed the victim's autopsy. Dr. Metcalfe opined that the victim's probable cause of death was a gunshot wound to the head and that the victim's manner of death was homicide. Dr. Metcalfe said he compared the photographs where the TBI had conducted test patterns of the suspect firearm with the photographs from the victim's autopsy and opined that the muzzle of this handgun was approximately two feet from the victim's gunshot wound. He also stated that because of the similarity between the droplets of blood on the knives and the droplets of blood on the floor at the crime scene, he believed that the two knives were already lying on the floor at the time the victim was shot. Dr. Metcalfe opined that blood got underneath one of the knives when someone, either the EMS workers or the victim, pressed down on the knife, which made it come in contact with blood that was on the floor.

Officer Adams testified that she was one of the first two officers to arrive at the scene before the EMS workers arrived. When she entered the victim's apartment, she observed the victim lying on the kitchen floor. The victim had blood in her face and hair, and blood was pooled around her body. Later, Officer Adams was told to go to Erlanger Hospital because a large crowd of individuals had gathered there to be close to the victim. She then was told that the Defendant was a suspect in the victim's murder and that she needed to locate him. Officer Adams drove to the hospital, and when the Defendant arrived there, she told him that he needed to come with her and that while he was not under arrest, she needed to place him in handcuffs for her safety and for his own safety. She said the Defendant was cooperative and upset and seemed very concerned about the victim. She transported him to the police station to meet with Investigator Puglise. Officer Adams said she was present when the Defendant gave his statement to Investigator Puglise and acknowledged that the Defendant was upset and crying during the interview. She noted that while the Defendant was hysterical at certain times during the interview, at other times he was calm. Officer Adams also recalled the Defendant lying on the floor on one occasion and then standing up during the interview.

Investigator Puglise provided testimony at trial that was similar to his testimony at the suppression hearing. He stated that when he got to the crime scene, it had been secured, and the victim had been transported to the hospital. He approached the front door of the victim's apartment and observed two large pools of blood. He said it appeared that there had been some kind of struggle in the kitchen because the stove had been pulled out and the refrigerator had been moved. He next talked to two witnesses at the scene, Sherill Jones and Kimberly Bell. Jones informed him that she had seen the

Defendant running back and forth to a Dodge Durango that was parked on Grove Street. Jones added that if the Defendant had hidden a gun anywhere, it was probably behind the Durango.

Investigator Puglise walked over to the Durango and noticed the sewer drain. Moments later, Investigator Burnette spotted a Springfield .40 caliber semiautomatic handgun in the drain, and this gun was collected as evidence. While Investigator Puglise was on the scene, he discovered that the Defendant and the victim had been arguing that morning and that the Defendant had been seen outside the victim's apartment holding a handgun.

Investigator Puglise stated that the Defendant's interview began at 11:43 a.m. Although the Defendant was initially handcuffed, Investigator Puglise told Officer Kendra Adams to remove the handcuffs for the interview. Investigator Puglise read the Defendant his constitutional rights from the Chattanooga Police Department's Miranda Waiver Form, and then he gave the Defendant the opportunity to read these rights. He told the Defendant that if he had any questions, he could ask them. He said the Defendant appeared to understand his rights and initialed each sentence indicating that he understood each of his rights. Investigator Puglise said the Defendant also appeared to understand the last section of the form, which was the waiver of rights. At the time of the interview, the Defendant did not appear to be under the influence of alcohol or any other substance. Investigator Puglise said the Defendant verbally agreed to waive his rights before signing the waiver form. Thereafter, Investigator Puglise and Officer Adams signed this form. The audio/video recording of the Defendant's interview was played for the jury. During the interview, the Defendant provided several different explanations as to what happened to the victim. Investigator Puglise acknowledged that the Defendant got visibly upset at different points during the interview.

Alex Broadhag, a special agent with the TBI and an expert in firearms, testified that the bullet retrieved from the victim's body during the autopsy had been fired through the barrel of the Springfield .40 caliber semiautomatic handgun that was found at the crime scene. He stated that he examined the Springfield handgun and observed that a fired cartridge case, which should have been ejected from the weapon, was lodged in the ejection port causing a condition known as "stovepipe." He said that this "stovepipe" condition could occur if the handgun was dirty, which prevented the slide from coming back fully, or if the shooter did not hold his hand in a rigid manner when shooting, or if there was bad ammunition, or if the weapon had not been properly lubricated .

Agent Broadhag said that the Springfield .40 caliber handgun had three safeties—a trigger safety, a firing pin safety, and a grip safety. He said that in order to fire this handgun, the trigger safety and the grip safety had to be deactivated at the same time,

which meant that the operator would have to press down on the grip safety and pull the trigger fully to the rear in order to fire the gun. He also said that the gun had a firing pin safety, which prevented the gun from firing unless the trigger was pulled. Agent Broadhag explained that a gun with a hair trigger takes less than one pound of pressure to fire and that the Springfield .40 caliber handgun did not have a hair trigger because it required 5.75 pounds of pressure to be applied to the trigger in order for it to fire. He said that he test-fired the Springfield .40 caliber handgun and that it operated properly. He also asserted that there was nothing wrong with the handgun's safety features.

Quanmesha Satterfield, the Defendant's sister, testified that on May 13, 2014, she drove to the College Hill Courts apartments after someone notified her that something had happened to her brother. When she arrived, she saw the Defendant sitting in the middle of a field and crying. Ms. Satterfield[1] could not recall what the Defendant was wearing at the time, but she stated that he did not have a gun. As she put the Defendant's two children in the car, the Defendant kept saying, "[M]y girl, my girl." A short time later, the Defendant asked Ms. Satterfield to drive him to the hospital. During their car ride, the Defendant was "distraught, just crying" and finally told her that the victim had been injured and that he needed to go to the emergency room to make sure she was okay.

Ms. Satterfield said that a few days before the shooting, she saw the victim, who explained her frustration with the Defendant dating her and Breasia Hubbard. During this conversation, the victim said that the Defendant needed to choose who he was going to be with and that she was going to stab him if he didn't choose her.

The Defendant testified in his own behalf. Although he admitted that he had shot the victim, he denied murdering her. He stated that at the time of the shooting, he was a high school graduate and was twenty years old. The Defendant said he and the victim had been dating for five-and-a-half years and had two children together at the time of the shooting. The Defendant said he began dating Breasia Hubbard in 2012 while he was still dating the victim. Hubbard became pregnant with his child the first month they started dating, and Hubbard later discovered that he was also dating the victim. Approximately five or six months into Hubbard's pregnancy, the victim realized that he was dating Hubbard, and neither the victim nor Hubbard were happy with this situation.

On Mother's Day, May 11, 2014, the Defendant spent the first part of the day with Hubbard and the rest of the day with the victim. He also spent the night of May 11, 2014, with the victim. The next day, May 12, 2014, the Defendant and the victim discussed

---

[1] We have used the title "Ms." here to distinguish Quanmesha Satterfield from the Defendant, Taylor Satterfield. We have not used titles with the other witnesses for the purpose of efficiency, and we intend no disrespect to these individuals.

- 16 -

their relationship, and the victim informed him that he would have to choose between her and Hubbard.  The victim also told him that if he did not come home, she "would kick [his] stuff out."  The night of May 12, the Defendant dropped his son off at the victim's apartment and told the victim that he was spending the night at his aunt's house because he had to be in court the next morning.  Despite his statement to the victim, the Defendant took a cab to Hubbard's home and spent the night with her so that she could take him to court the following morning.

On the morning of May 13, 2014, Hubbard drove the Defendant to court.  When the Defendant realized that he had arrived too early, he called Hubbard and told her to pick him up.  Hubbard picked him up in her Dodge Durango, and then the Defendant drove the Durango to Hubbard's school, where he dropped her off.  The Defendant then drove Hubbard's vehicle to the College Hill Courts apartments so he could talk to the victim.  When he got there, he parked the Durango away from the victim's apartment so she would not see that he was driving Hubbard's vehicle and would not realize he had spent the night with Hubbard.

The Defendant said that the victim was cleaning her apartment when he arrived.  He walked into her apartment, sat on the couch, and told her about going to court.  The victim talked to him but gave him very short responses and appeared to be upset and frustrated.  When he asked her what was wrong, the victim shrugged and said nothing was wrong.  When the Defendant continued to ask her what was wrong, the victim informed him that she knew he had been with Hubbard.  The Defendant just shrugged and laughed.  When the victim continued to talk about his relationship with Hubbard, the Defendant decided to get a shirt and leave the victim's apartment.

The Defendant said that two or three weeks prior, he had brought his clothes from his aunt's house and had left them in the victim's kitchen because he did not feel like taking them upstairs.  His clothes were in a plastic tote with a lid, and he had placed a gun inside this tote.  When the Defendant walked into the kitchen to get his shirt, he noticed that the plastic tote was gone, and he asked the victim what she had done with his belongings.  The victim reminded him that she had told him she was going to put his belongings out of her house.

At that point, the Defendant walked outside to see if his belongings were still there.  He found his clothes and the gun and went back inside the house.  As he walked back up the steps to the victim's apartment, the Defendant was holding a bottle of Gatorade in his right hand and the gun in his left hand.

The Defendant said that when he got to the top of the steps, the victim told him to "get the f[--]k out" and began charging him with a knife in each hand.  The Defendant

said he tried to shield himself and step back and then heard the gun go off. At the time that the gun fired, the victim was two to three feet away from him. Because the Defendant believed the victim was going to stab him, he reacted by stepping back, shielding himself, and putting his hands up to block her. He said that when he raised his hands up to shield himself, he heard the gun go off and saw the victim fall back. After the gun fired, the Defendant panicked, ran outside, and asked for help. The Defendant thought he had shot the victim but was hoping the bullet had missed her. He ran down the back steps of the apartment and asked people for help. At that point, the Defendant was still holding the gun in his hand. He realized that people were looking at him, so he walked to the Durango and set the gun in a nearby sewer drain because he was "scared and didn't know what was going on." He said he was "in a panic" and "just wanted to go back there and just be with [the victim] while she [was] right there." The Defendant said he "didn't want to be on the scene with a gun while the police pull[ed] up or anything like that."

The Defendant returned to the victim's apartment and made sure that someone had called the paramedics. At the time, he was crying and continuing to ask people to help him. When someone told him to make sure that his children were out of the apartment, he attempted to open the back door to the victim's apartment but it had locked behind him. He began knocking on the door, and a neighbor let him into the building. He walked up the stairs to the victim's apartment, and several people followed behind him.

When he got to the victim's apartment, he saw the victim lying on the floor and knew that she had been shot. He walked upstairs, saw that his daughter had already been taken elsewhere, and picked up his son. He went downstairs, walked out the front door to avoid the kitchen, and took his son to his sister-in-law's apartment in the same complex. Shortly thereafter, his sister arrived and took him and the children to the hospital, where he stayed for ten minutes until an officer placed him in handcuffs and took him to the police station to be interviewed.

The Defendant acknowledged that he had lied to the police several times during his interview. He said that the first lie was when he told the police that he went to the victim's apartment and found her dead. He said his second lie was when he told the officers that the victim grabbed the gun as he was trying to commit suicide, and it went off . Finally, the Defendant said he told the police a story similar to what he had testified to at trial; however, he acknowledged that this third version also contained some lies. He said he lied to Investigator Puglise because he was "scared" and "was in a panic." Although he admitted to telling these lies, the Defendant asserted that his trial testimony about the shooting was the truth. He maintained that he never intended to shoot and kill the victim.

**Sentencing.** At the September 12, 2016 sentencing hearing, the State entered the Defendant's presentence investigation report as an exhibit. William Atwell, a K-9 officer with the Chattanooga Police Department, testified that in February 2013, he received reports of drug sales at the Defendant's home, and based on these reports, obtained a search warrant for this residence. On February 24, 2013, Officer Atwell executed the search warrant. When he and the other officers entered the home, the Defendant attempted to leave through the back door. The officers detained him in a laundry room and placed him in handcuffs. As Officer Atwell and the other officers walked with the Defendant to the front of the residence, they observed a large amount of marijuana on the Defendant's bed, and the Defendant admitted that this marijuana belonged to him. The Defendant also admitted that a small amount of marijuana on the dresser belonged to him.

Officer Atwell said that the amount of marijuana on the Defendant's bed was enough to qualify as a resale amount. He also noted that paraphernalia and baggies were found in the Defendant's bedroom. Officers also found a .38 caliber handgun underneath the Defendant's bed, and the Defendant offered that he had just sold a .357 handgun. A digital scale was also found in the Defendant's bedroom. Officer Atwell said the Defendant was ultimately charged regarding the marijuana and the firearm.

Amy Smart, the victim's mother, testified that in April 2013, the victim was living at home with her. Smart said that around 8:00 or 9:00 p.m. one night, she received a call from the victim, who was very upset. The victim and her children were crying, and the victim told her that the Defendant was beating on the door, the wall, and the window in an attempt to get inside Smart's home. The victim said she had told the Defendant to leave, but he refused. Before Smart and the victim ended their phone conversation, Smart heard a window break, and the victim informed her that the Defendant had broken the front window. Smart immediately made a U-turn and returned home. When she arrived, she observed broken glass from her front window inside and outside her home and noted that the Defendant was no longer there. Smart said she and the victim immediately called the police, and the victim gave a statement about the incident. Smart later banned the Defendant from coming to her home.

Smart also detailed an incident that occurred during Christmastime in 2011 when the victim's and Defendant's daughter was five months old. She said the Defendant and the victim were arguing, and the Defendant called Smart's phone and told her that if she did not give him his daughter's car seat, he would shoot her and the victim.

Smart said that on May 13, 2014, she was the first person to arrive at the hospital after the victim was shot and that the Defendant did not arrive at the hospital with the children until an hour-and-a-half later. When Smart was told that the victim passed

away, she said she felt like she "wanted to die too." Smart said, "It's hurtful that [the victim] didn't have to be taken at all. . . . I'm looking at her kids every day, plus me and [the victim] spent 20 years every day together." She said that the victim's son had to see a counselor because of his mother's death and that the victim's daughter talked about her mother dying all the time.

Quanmesha Satterfield, the Defendant's sister, testified that she and her brother were raised in the same household and that her brother did not have a father figure in his life until he was older. Ms. Satterfield stated that their mother passed away when her brother was seventeen years old and that he took her death "the hardest because he was the baby." She said her brother was "a good person," was a great father, and took care of his children every day. She added that she would help her brother when he got released from prison and that her brother's aunts and uncles, cousin, and grandmother would also help support the Defendant upon his release.

Sheree Lomnick, the Defendant's cousin, testified that the Defendant was "a great father" who spent a lot of time with his children. Lomnick described the Defendant as "loving, caring, sweet, smart" and said she would support the Defendant whenever he was released from prison.

The Defendant made an allocution, stating that he "want[ed] to take full responsibility for [his] actions" and wanted to "apologize to both families and everyone who's been hurt by this mistake." He also apologized to his children. The Defendant asked that the trial court take into consideration the fact that he had three children, two of whom had already lost their mother, when determining the length of his sentence.

At the conclusion of the sentencing hearing, the court found that a sentence close to the maximum in the range was appropriate. It then sentenced the Defendant to twenty-two years for his second degree murder conviction.

Following sentencing, the Defendant filed a timely motion and amended motion for new trial, which were denied. Thereafter, the Defendant filed a timely notice of appeal.

## ANALYSIS

**I. Denial of Motion to Suppress.** The Defendant argues that the trial court erred in denying his motion to suppress his statement to police. While the Defendant acknowledges that Investigator Puglise advised him of his Miranda rights at the beginning of the interview, he claims Investigator Puglise and Officer Adams undermined this warning through their later statements to him. The Defendant also

claims that his emotional state at the time of his statement renders most, if not all, of his statement involuntary.  The State counters that the interview was not coercive and that although the Defendant was upset after learning of the victim's death, his will was not overborne.  We agree with the State.

A trial court's findings of fact at a suppression hearing are binding on an appellate court unless the evidence preponderates against them.  State v. Bell, 429 S.W.3d 524, 528 (Tenn. 2014); State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996).  "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact."  Odom, 928 S.W.2d at 23.  The prevailing party in the trial court "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence."  Id.; see Bell, 429 S.W.3d at 529.  Despite the deference given to trial court's findings of fact, this court reviews the trial court's application of the law to the facts de novo with no presumption of correctness.  State v. Montgomery, 462 S.W.3d 482, 486 (Tenn. 2015) (citing State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001)); State v. Day, 263 S.W.3d 891, 900 (Tenn. 2008) (citing State v. Williams, 185 S.W.3d 311, 315 (Tenn. 2006); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997)).  When evaluating the correctness of a trial court's ruling on a motion to suppress, this court may consider not only the proof offered at the suppression hearing but also the evidence presented at trial.  State v. Bishop, 431 S.W.3d 22, 35 (Tenn. 2014); State v. Williamson, 368 S.W.3d 468, 473 (Tenn. 2012).

The Fifth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  Similarly, the Tennessee Constitution provides "that in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself."  Tenn. Const. art. I, § 9.  This right against self-incrimination gives criminal defendants the right to remain silent.  State v. Davidson, 509 S.W.3d 156, 191 (Tenn. 2016) (citing State v. Dotson, 450 S.W.3d 1, 52 (Tenn. 2014)).

**A.  Whether Officers Undermined Miranda Warning.**  While the Defendant acknowledges that Investigator Puglise advised him of his Miranda rights at the beginning of the interview, he claims that when he became distraught and seemed reluctant to continue answering questions, Investigator Puglise and Officer Adams "pressed [him] by repeatedly instructing [him] to answer their questions," thereby undermining the prior Miranda warning.  Referencing Missouri v. Seibert, 542 U.S. 613 (2004) and its progeny, the Defendant asserts that if pre-warning actions of law enforcement can deprive the Miranda warning of meaning, then post-warning actions of law enforcement can be even more injurious to the procedural safeguards contained

within Miranda. He asserts the officers' statements were not merely misleading or confusing but were in direct conflict with the rights outlined in Miranda because if "the police can give a Miranda warning[] and then tell the Defendant that he must answer their questions, then the warning itself is devoid of all meaning."

In Miranda v. Arizona, 384 U.S. 436, 444 (1966), the United States Supreme Court created procedural safeguards to protect the privilege against self-incrimination. Miranda compels law enforcement to warn an individual prior to a custodial interrogation

> that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

Id. at 479. The opportunity to exercise the aforementioned rights must be afforded to the individual throughout the interrogation. Id. After these warnings are given and an opportunity to exercise these rights afforded, the person being questioned may knowingly and intelligently waive these rights and agree to answer questions or make a statement to law enforcement. Id. If the individual invokes his or her right to remain silent, the interrogation must cease. Id. at 473-74. However, an individual who seeks to invoke his right to remain silent must do so unambiguously. Berghuis v. Thompkins, 560 U.S. 370, 381-82 (2010); Davidson, 509 S.W.3d at 192 (citing Dotson, 450 S.W.3d at 53).

In Berghuis, 560 U.S. at 381, the United States Supreme Court noted that while that it "has not yet stated whether an invocation of the right to remain silent can be ambiguous or equivocal, . . . there is no principled reason to adopt different standards for determining when an accused has invoked the Miranda right to remain silent and the Miranda right to counsel[.]" The court then concluded that respondent's prolonged silence in response to police questioning did not constitute an unambiguous invocation of the right to remain silent. Id. at 381-82. The court recognized that the respondent never said that "he wanted to remain silent" or that "he did not want to talk with the police" and held that if he had "made either of these simple, unambiguous statements, he would have invoked his "'right to cut off questioning.'" Id. at 382 (citing Michigan v. Mosley, 423 U.S. 96, 103 (1975)).

We conclude that the Defendant's reliance on Seibert and its progeny is misplaced. In Seibert, the United States Supreme Court held that "when Miranda warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and 'depriv[e] a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.'" Seibert, 542 U.S. at 613-14 (quoting Moran v. Burbine, 475 U.S. 412, 424 (1986)); see State v.

Dailey, 273 S.W.3d 94, 108-09 (Tenn. 2009) (concluding that the Defendant's second confession was inadmissible because the late Miranda warnings, which were given after the Defendant's initial unwarned confession, were not effective to inform him that he had an opportunity to remain silent). In contrast to Seibert and Dailey, the Defendant in this case was given Miranda warnings prior to the beginning of his interview, and no coercive police activity occurred prior to him receiving the Miranda warnings. Accordingly, any claim that the Defendant was misled or deprived of knowledge essential to understanding his rights is unpersuasive.

The Rights Waiver Form informed the Defendant that he had the right to remain silent, that he had the right to an attorney, and that he had the right to have an attorney present during questioning. This form also advised him that if he decided to answer questions without an attorney, then he had the right to stop answering questions at any time. The record shows that Investigator Puglise read the Rights Waiver Form to the Defendant, and the Defendant initialed each of his rights before signing the Rights Waiver Form. The recording of the interview shows that the Defendant never refused to be interviewed, requested an attorney, or unambiguously invoked his right of silence before or during the interview. At the conclusion of the suppression hearing, the trial court held that the officers' statements to the Defendant were not coercive. After considering the evidence, we agree with the trial court and conclude that the officers' statements did not negate or undermine the Miranda warnings given prior to the start of the Defendant's interview.

**B. Whether Statement was Involuntary.** The Defendant also argues that even if the Miranda warning requirement was followed, his statement was involuntary and, therefore, inadmissible. Referencing the Climer factors for evaluating the voluntariness of a statement, the Defendant argues that his young age and his mental health weigh against a finding that his statement was voluntary. See State v. Climer, 400 S.W.3d 537, 568 (Tenn. 2013). In particular, he asserts that he was twenty years old at the time of the interview, which gave him the benefit of far fewer life experiences than most people, and that his mental health had been severely compromised by the news that the victim had just died. The Defendant emphasizes that a review of the video recording of his statement shows that he was "severely distraught, crying, and repeatedly uttering, 'My girl, my girl.'" While acknowledging that age and mental health are just two of many factors to be considered under Climer, the Defendant asserts that the weight of these two factors, especially his mental health, shows that "his confession was not the product of a rational, intentional act."

Because "coerced confessions are inherently unreliable," only voluntary confessions are admissible. Climer, 400 S.W.3d at 567. In order for a statement to be voluntary, it "'must not be extracted by any sort of threats or violence, nor obtained by

any direct or implied promises, however slight, nor by the exertion of any improper influence.'" State v. Kelly, 603 S.W.2d 726, 727 (Tenn. 1980) (quoting Bram v. United States, 168 U.S. 532, 542-43 (1897)).

Whether a confession is involuntary is a question of fact. State v. Willis, 496 S.W.3d 653, 695 (Tenn. 2016) (citing State v. Sanders, 452 S.W.3d 300, 305 (Tenn. 2014)). The State has the burden of establishing the voluntariness of a confession by a preponderance of the evidence. Id. (citing Sanders, 452 S.W.3d at 305). "The test of voluntariness for confessions under article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." State v. Smith, 933 S.W.2d 450, 455 (Tenn. 1996); accord State v. Freeland, 451 S.W.3d 791, 815 (Tenn. 2014).

"The due process voluntariness test is distinct from Miranda." Davidson, 509 S.W.3d at 189 (citing Dickerson v. United States, 530 U.S. 428, 434-35 (2000); Mincey v. Arizona, 437 U.S. 385, 397-98 (1978)). "[T]he essential inquiry under the voluntariness test is whether a suspect's will was overborne so as to render the confession a product of coercion." Id. (citing Freeland, 451 S.W.3d at 815). The voluntariness test requires this court to assess the psychological impact on the accused and to evaluate the legal significance of the accused's reaction. Id. (citing Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)). When determining whether a confession was made voluntarily, this court must examine the totality of the circumstances, including the "characteristics of the accused and the details of the interrogation." Id. (citing Dickerson, 530 U.S. at 434). These circumstances include:

> "[T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured[,] intoxicated[,] or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep[,] or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse."

Climer, 400 S.W.3d at 568 (quoting State v. Huddleston, 924 S.W.2d 666, 671 (Tenn. 1996)).

At the time that the Defendant gave his statement to police, he was twenty years old and had graduated from high school. The Defendant was familiar with the criminal

justice system because, at the time of his interview, he had already been convicted of possession of a controlled substance, simple possession of less than one-half ounce of marijuana, and possession of a handgun while under the influence. Investigator Puglise informed the Defendant of his Miranda rights by reading the statement of rights and the Rights Waiver Form prior to the start of the interview. The Defendant initialed each right and signed the form indicating that he understood his rights and was voluntarily waiving them in order to provide a statement to police. The audio/video recording of the Defendant's interview shows that he was not intoxicated, impaired, injured, physically abused, threatened, or deprived of food, sleep, or medical attention. The recording does not show that the questioning was prolonged or that the Defendant was detained for an excessive period of time before giving his statement. When Investigator Puglise offered to give the Defendant time in order to get his emotions under control after learning of the victim's death, the Defendant told him that he would rather get the interview out of the way.

We agree with the trial court's findings that the Defendant's will was not overborne by the actions of the police. We also agree with the court that the Defendant's distress did not prevent him from initially denying any knowledge of the shooter, that the officers did not coerce the Defendant by making promises or threats, and that Officer Adams' exhortations to "hang in there for your kids" were given for the purpose of helping the Defendant get his emotions under control rather than for the purpose of coercion. Based on the totality of the circumstances, we conclude that the Defendant was advised of his right to counsel and right to remain silent, that he understood these rights, and that he voluntarily waived these rights before giving his statement to police. Because the record fully supports the trial court's denial of the suppression motion, the Defendant is not entitled to relief on this issue.

**II. Insufficiency of the Evidence.** The Defendant also contends that the evidence is insufficient to sustain his conviction for second degree murder. He claims that no rational trier of fact could have concluded beyond a reasonable doubt that he did not act in self-defense. He also claims that even if he failed to prove that he acted in self-defense, no rational trier of fact could have lawfully convicted him of any crime more serious than voluntary manslaughter. The State responds that the evidence is sufficient to sustain the Defendant's conviction for second degree murder, and we agree.

When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)). "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally

insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). When evaluating the sufficiency of the convicting evidence, this court must determine "'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting Hanson, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

Second degree murder is defined as "[a] knowing killing of another," T.C.A. § 39-13-210(a)(1), and is a result-of-conduct offense, State v. Davis, 466 S.W.3d 49, 69 (Tenn. 2015). Therefore, as relevant in this case, a person acts knowingly "when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-302(b).

The Defendant first contends that no rational jury could have concluded beyond a reasonable doubt that he did not act in self-defense. Tennessee Code Annotated section 39-11-611(b), which was in effect at the time of the offense, states, in pertinent part:

> (1) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.

- 26 -

(2) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

(A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;

(B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

(C) The belief of danger is founded upon reasonable grounds.

T.C.A. § 39-11-611(b) (Supp. 2012). "The State carries the burden of proving that the defendant did not act in self-defense." State v. Sims, 45 S.W.3d 1, 10 (Tenn. 2001) (citing State v. Belser, 945 S.W.2d 776, 782 (Tenn. Crim. App. 1996)). The jury, as the trier of fact, determines whether the defendant acted in self-defense. State v. Dooley, 29 S.W.3d 542, 547 (Tenn. Crim. App. 2000) (citing State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997)). It is within the jury's prerogative to reject a claim of self-defense. Goode, 956 S.W.2d at 527.

The Defendant contends that the evidence presented at trial supports his self-defense claim. He asserts that his testimony at trial was that the victim charged him with a knife in each hand when the shooting occurred. The Defendant asserts that his own testimony regarding the circumstances surrounding the shooting is corroborated by the testimony from multiple witnesses that knives were lying on the floor in the kitchen after the shooting, by the testimony of Breasia Hubbard and Quanmesha Satterfield that the victim said she intended to stab him, by evidence that the fired cartridge case became lodged in the ejection port of the handgun, and by testimony from Alex Broadhag that an improper firing grip was a common cause of this firing malfunction. He claims that this evidence supports his self-defense claim by suggesting that the shooting was "hurried" and "without time [for him] to obtain a proper grip on the handgun" rather than "an intentional, deliberate act."

Despite the Defendant's claim, we conclude that other proof presented at trial established that the Defendant did not act in self-defense when he shot the victim. At trial, Kimberly Bell testified that when she entered the victim's apartment, she observed the victim on the floor clutching a set of keys in her hands. In addition, Gregory Mardis testified that the knives on the victim's kitchen floor had blood spatter on the handles, which weighs against a finding of self-defense. Finally, Dr. Metcalfe testified that because of the similarity between the droplets of blood on the knives and the droplets of

blood on the floor at the crime scene, he believed that the knives were already lying on the floor when the victim was shot. The jury, by its verdict, rejected the Defendant's claim that he shot the victim in self-defense and accredited the State's version of the facts. Because a decision regarding self-defense is within the province of the jury, the Defendant is not entitled to relief on this issue.

The Defendant also argues that he should have been convicted of voluntary manslaughter, rather than second degree murder. He claims the proof at trial established that he and the victim were engaged in a heated argument and that he shot the victim in a state of passion produced by adequate provocation. He notes that appliances in the kitchen were in disarray, that his own belongings had been thrown on the back porch, and that he was severely distraught after the shooting. He claims that this evidence establishes that their argument had risen to a level causing him, a reasonable person, to behave in an irrational manner. We recognize that the jury heard and rejected this argument at trial, and we will not reweigh or reevaluate the evidence in this case. Wagner, 382 S.W.3d at 297. Consequently, the Defendant is not entitled to relief on this issue.

The evidence presented at trial showed that the victim had previously informed the Defendant that if he did not come home, she would throw his belongings out of their home. The night before the victim's murder, the Defendant spent the night with Breasia Hubbard. When he returned to the victim's house the next day, the victim told him to get out of her home and had already thrown his clothes outside, which angered the Defendant. He retrieved his gun from outside and returned to the victim's apartment, where they argued. Then the Defendant, while standing two to three feet from the victim, fatally shot the victim in the head. Given this evidence, a rational jury could have found the Defendant guilty of second degree murder. Therefore, we conclude that the evidence is sufficient to sustain the Defendant's conviction for second degree murder.

**III. Excessive Sentence.** Lastly, the Defendant maintains that the trial court abused its discretion when it imposed an excessive sentence for his second degree murder conviction. He contends that the trial court gave no weight to the mitigating factor of his youth, gave insufficient weight to the mitigating factors regarding his substantial family support, the loss of his mother, and the absence of his father, and gave too much weight to the enhancement factors in this case, particularly his criminal behavior with firearms. The State counters that the trial court did not abuse its discretion because it imposed a within-range sentence that complied with the purposes and principles of the sentencing act. We conclude that the trial court did not abuse its discretion in imposing a twenty-two-year sentence.

At the conclusion of the sentencing hearing, the trial court stated that it was considering all the proof at trial, including that the victim was "killed by a gunshot, that she was the mother of two children, [and] that she was the girlfriend of this defendant." The court also said it was considering the information in the presentence report, the testimony and statements from different individuals, and the allocution given by the Defendant. The court properly held that the Defendant was a Range I offender and that his sentencing range was fifteen to twenty five years with a release eligibility of 100%. See T.C.A. §§ 39-13-210, 40-35-112(a)(1).

The trial court then applied the "catch-all" mitigating factor because the Defendant had a supportive family, the Defendant had no father when he was growing up, the Defendant's children would have no father because of the crime he committed, and the Defendant's mother died while he was a minor. See id. § 40-35-113(13). While the court gave some weight to the fact that the Defendant had a supportive family, the court gave little weight to the other mitigating circumstances.

The trial court then made the following statement regarding the Defendant's association with guns:

> [T]he roadmap I see . . . in regard to [the Defendant] is a continual involvement with guns and . . . that really bothers me. Guns with the testimony of Officer Atwell. Guns—five days before this happened [the Defendant] was convicted of having guns. So you can kind of chart it that people who concern themselves with guns over and over and over again may result in something happening like [what] tragically happened in this courtroom from which all these family members are suffering. So sadly you can see those things getting ready to occur.

The court then applied several enhancement factors. The court applied enhancement factor (1), that the Defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range, and gave this factor great weight. See id. § 40-35-114(1) (Supp. 2013). The court observed that the Defendant had a history of criminal behavior that involved vandalism, theft, possession of drugs, and possession of guns. The court also noted that the Defendant had a history of criminal convictions because he had received three misdemeanor convictions for possession of a controlled substance, simple possession of less than one-half ounce of marijuana, and possession of a handgun while under the influence of alcohol or drugs. Moreover, the court recognized that on July 28, 2013, the Defendant had been charged with simple possession of marijuana and possession of a handgun while under the influence and on May 8, 2014, just five days before the victim's murder, the Defendant had been convicted of both of these offenses.

- 29 -

The trial court applied enhancement factor (9), that the Defendant possessed or employed a firearm during the commission of the offense, because he used a firearm to the commit the second degree murder offense. See id. § 40-35-114(9) (Supp. 2013). The court also applied enhancement factor (13), because the Defendant was released on probation five days before murdering the victim in this case. See id. § 40-35-114(13) (Supp. 2013). With regard to the Defendant's potential for rehabilitation, the court noted that the Defendant had never worked. After considering all the mitigating and enhancement factors applicable in this case, the court noted that a sentence close to the maximum in the range was appropriate. It then sentenced the Defendant to a twenty-two-year sentence for his second degree murder conviction.

Initially, we note that the 2005 amendments to the sentencing act "served to increase the discretionary authority of trial courts in sentencing." State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). In light of this broader discretion, "sentences should be upheld so long as the statutory purposes and principles, along with any applicable enhancement and mitigating factors, have been properly addressed." Id. at 706. The amendments to the sentencing act also "rendered advisory the manner in which the trial court selects a sentence within the appropriate range, allowing the trial court to be guided by—but not bound by—any applicable enhancement or mitigating factors when adjusting the length of a sentence." Id. Because of this broader discretion,

> a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005. So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld.

Id. Accordingly, this court reviews a trial court's sentencing determinations under "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707.

Pursuant to the 2005 amendments to the sentencing act, a trial court must consider the following when determining a defendant's specific sentence:

(1)  The evidence, if any, received at the trial and the sentencing hearing;
(2)  The presentence report;
(3)  The principles of sentencing and arguments as to sentencing alternatives;
(4)  The nature and characteristics of the criminal conduct involved;

- 30 -

> (5)    Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
>
> (6)    Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and
>
> (7)    Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40-35-210(b). The defendant has the burden of showing the impropriety of the sentence on appeal. Id. § 40-35-401(d), Sentencing Comm'n Cmts. The trial court shall impose "a sentence justly deserved in relation to the seriousness of the offense[.]" Id. § 40-35-102(1). The court must consider the defendant's potential for rehabilitation or treatment. Id. §§ 40-35-102,-103. In addition, the court must impose a sentence "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Id. §§ 40-35-103(2), (4).

In challenging his sentence, the Defendant argues that the trial court gave insufficient weight to his mitigating factors and too much weight to the enhancement factors, particularly his history of criminal behavior. He asserts that if the court had started from the bottom of the applicable sentencing range and had properly weighed the enhancement and mitigating factors, he would have received a shorter sentence. See id. §§ 40-35-210(c)(1), (2).

As we noted, the trial court is guided by, but not bound by, any applicable enhancement or mitigating factors when imposing a sentence, and we will not disturb a trial court's sentence unless the court wholly departed from the purposes and principles of the Sentencing Act. See Bise, 380 S.W.3d at 706. The record shows that the trial court carefully considered the evidence as well as the proposed enhancement and mitigating factors. Although the Defendant claims the trial court gave insufficient weight to his mitigating factors, the trial court considered these mitigating factors prior to imposing a sentence in this case. The court also articulated its reasoning in applying each mitigating and enhancement factor and the weight it gave to each factor.

After reviewing the record, we conclude that the trial court did not abuse its discretion in sentencing the Defendant to twenty-two years in confinement. The evidence presented, the nature of the criminal conduct involved, and the trial court's application of enhancement factors (1), (9), and (13) provide a sufficient basis for the trial court's imposition of a within-range, twenty-two-year sentence. Because the record establishes that the trial court properly considered the purposes and principles of sentencing as well

as the applicable mitigating and enhancement factors, we uphold the Defendant's twenty-two-year sentence.

## **<u>CONCLUSION</u>**

Based on the aforementioned authorities and reasoning, the judgment of the trial court is affirmed.

_____
CAMILLE R. MCMULLEN, JUDGE